UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETS

CIVIL ACTION NO.

| | |
|---|---|
| JOSE RUIZ and | ) |
| JUAN RUIZ, | ) |
|     Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| P.O. TYRONE C. JONES, | ) |
| P.O. HENRY TURGEON III, | ) |
| DET. JASON GOMES, | ) |
| DET. SGT ROBERT J. AGUIAR, | ) |
| DET. JOHN PEREIRA, | ) |
| DLT DAVID LIZOTTE, | ) |
| SGT. PAUL J. OLIVEIRA, | ) |
| NEW BEDFORD POLICE | ) |
| OFFICERS IN THEIR INDIVIDUAL | ) |
| AND OFFICIAL CAPACITIES, | ) |
| NEW BEDFORD POLICE DEPARTMENT | ) |
| RONALD E. TEACHMAN, POLICE CHIEF | ) |
| IN HIS OFFICIALCAPACITY, | ) |
| SCOTT W. LANG, MAYOR | ) |
| IN HIS OFFICIALCAPACITY, | ) |
| THE CITY OF NEW BEDFORD, | ) |
|     Defendants | ) |

COMPLAINT AND REQUEST FOR JURY TRIAL

*INTRODUCTION*

1.     This is an action to recover money damages for violation of plaintiffs' Constitutional rights and for state torts, to wit: serious physical injury inflicted by police officers without justification on or about February 28, 2007.

*JURISDICTION*

2.     This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the pendent jurisdiction of this Court to hear and decide claims arising under Massachusetts tort law.

*PARTIES*

3. Plaintiffs Jose and Juan Ruiz were at all material times hereto, citizens of the United States and residents of Bristol County, Massachusetts.

4. Defendant Ronald Teachman ("Teachman") is an individual residing within the Commonwealth of Massachusetts. Teachman is a party to this lawsuit in his official capacity as Police Chief of the NBPD.

5. Defendant Scott Lang is and was at all times material to this complaint the mayor of New Bedford responsible for appointing New Bedford Police personnel per the City's charter.

6. Defendant New Bedford Police Department ("NBPD") is an agency within the City of New Bedford, with an office and principal place of business in New Bedford, Bristol County, Massachusetts.

7. Defendant Tyrone Jones ("Jones") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

8. Defendant Henry Turgeon, III ("Turgeon") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

9. Defendant Jason Gomes ("Gomes") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

10. Defendant Sgt. Robert J. Aguiar ("Aguiar") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

11. Defendant David Lizotte ("Lizotte") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

12. Defendant John Pereira ("Pereira") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

13. Defendant Paul Olivera ("Olivera") was at all times material hereto a police officer of the NBPD, and he is sued in his official and individual capacities.

14. Defendant City of New Bedford ("the City") is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts, with an office and principal place of business in New Bedford, Bristol County, Massachusetts, and at all times relevant hereto, employed the individual defendants.

15. At all times pertinent hereto the each of the individual defendants was a sworn police officer of the NBPD acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of New Bedford.

*FACTS*

16. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

17. At all times pertinent hereto defendants Turgeon, Lizotte and Aguiar were members of the organized crime unit in the NBPD detective division.

18. On information and belief, Lizotte was responsible for supervising defendants Gomes, Aguiar and Pereira.

19. At all times pertinent hereto Tyrone Jones was a member of Patrol 3B shift.

20. At all times pertinent hereto Paul Oliveira was a member of Patrol 1A shift.

21. At all times pertinent hereto John P. Pereira was a member of Patrol 1C shift.

22. At all times pertinent hereto Tyrone Jones was a member of Patrol 3B shift.

23. On February 28, 2007, the defendant officers arrested and handcuffed Juan Ruiz without probable cause.

24. Juan Ruiz was forced off the road by two police vehicles.

25. Juan Ruiz was pulled from his vehicle, taken to the ground and handcuffed.

26. When Juan Ruiz asked what was going on, officers of the New Bedford Police Department stated they had a search warrant for Juan Ruiz's home.

27. Juan asked what they expected to find, and officers (names unknown) stated "Oh, we'll find something" or words to that effect.

28. No officer showed Mr. Ruiz the search warrant at the time he was handcuffed.

29. Juan Ruiz had recently had knee surgery and needed a cane in order to walk.

30. Juan was taken in a cruiser to his home at 20 Viall Street.

31. Turgeon drove Juan Ruiz' pickup, containing his girlfriend and child to 20 Viall Street, and arrived at 20 Viall Street slightly later.

32. En route, Turgeon repeatedly asked Juan's girlfriend Marisa Katramados if Jose was at the apartment, stating that he saw Jose at the apartment frequently.

33. Jose had been helping his brother Juan to move, since Juan had recently had leg surgery.

34. Turgeon told Juan's girlfriend that DSS was going to take her son away.

35. Turgeon told Juan's girlfriend that Jose should come get the child, because the police were not going to wait for family members from Randolph to come down and get him.

36. When the cruiser carrying Juan Ruiz arrived at 20 Viall Street, Juan had to hop to his apartment building without the aid of his cane.

37. Juan's cane was left in his pickup truck when the police pulled him out of his truck, took him to the ground and handcuffed him.

38. Defendants did not show a search Juan Ruiz before gaining entry into his home.

39. Defendant officers tried keys from Juan Ruiz's keychain until they gained entry into his home.

40. At no time prior to entering Juan Ruiz's home did any officer show Juan Ruiz the search warrant for 20 Viall Street.

41. Shortly after entering Juan Ruiz's home, one officer (name unknown to Juan Ruiz) said, "We got something!"

42. Juan Ruiz was kept outside the premises prior to this find.

43. Officers claimed they found heroin at the premises and informed Juan Ruiz and his girlfriend Marisa Katramados that they were being arrested.

44. The contraband allegedly found was never shown to Juan or Marisa.

45. The contraband allegedly found was never produced when the police were supposed to bring the evidence to court, and all the charges against Juan Ruiz were dismissed.

46. Officers trashed the apartment and dumped prescription medications belonging to Juan for his recent knee surgery into evidence bags.

47. New boxes of cereal were opened and dumped out, and spices were dumped on top.

48. More than twenty moving boxes in the home were not opened by police, even though they were purportedly looking for drugs.

49. Defendant Turgeon told Marisa Katramados that she needed to call her brother in law Jose Ruiz to the house to pick up her child, because he was nearby, or DSS would be called.

50. Marisa Katramados offered to have one of her family pick up her son Kaydan.

51. When Marisa told Turgeon it would take a half hour for a family member to retrieve Kaydan, because they were coming from Randolph, Marisa was told by police that that was too long.

52. Specifically, it was explained to Marisa that the officers were not going to wait for other members of her family to come from distances of 30-40 minutes drive away to pick up the child.

53. One officer then told Marisa that she should call Juan's brother, Jose to pick up the child.

54. The officers knew Jose Ruiz was nearby.

55. Police had been surveilling Juan Ruiz's residence, and knew Jose was frequently there helping his brother Juan (who was disabled after having knee surgery) and Juan's girlfriend Marisa to pack boxes for a move.

56. Jose Ruiz was known to defendants Aguiar and Pereira.

57. Defendants Aguiar and Pereira had a past with Jose Ruiz and were angry with Jose Ruiz.

58. Officers Aguiar, Pereira, Jones, Turgeon and Oliveira conspired to ambush Jose Ruiz at the 20 Viall Street address.

59. At the urging of defendant Turgeon, Marisa made a phone call and communicated to Jose Ruiz that her house was being raided by police and he needed to come pick up her son at that address.

60. Jose told Marisa on the phone that he would be right over to pick up her son.

61. After Marisa got off the phone with Jose Ruiz, Turgeon asked Marisa, "Is Jose coming?"

62. Several officers went into a bedroom and spoke in tones Maris could not hear.

63. Next Marisa saw Aguiar enter her kitchen grinning, shortly before Jose arrived.

64. Jose and his girlfriend drove to the 20 Viall Street address to pick up Kaydan.

65. Jose's girlfriend, who was pregnant, waited in the car on arriving at 20 Viall Street.

66. Jose arrived approximately ten minutes after the call from Marisa.

67. Jose was able to walk into the apartment because the officers had left the front door, hallway door, and apartment doors open, despite the fact they were executing a search warrant.

68. On arriving at the apartment Jose Ruiz was asked his identity by Officer Turgeon.

5

69. Juan Ruiz and Marisa Katramados were seated in their dining room.

70. Jose Ruiz cooperated and identified himself to Turgeon as Jose Ruiz and to explain he was there to pick up his nephew Kaydan, as requested by Marisa.

71. Jose Ruiz was grabbed from behind in a chokehold by defendant Robert Aguiar, who came from the kitchen.

72. As soon as Jose Ruiz was placed in a chokehold by Aguiar, Pereira grabbed Jose's right arm and Oliveira grabbed Jose's left arm, and both of Jose's arms were twisted upwards.

73. Upon information and belief, Aguiar and Pereira knew before this date that Jose Ruiz had had an operation on the left side of his head and had had hand surgery on his right hand.

74. Tyrone Jones came in front of the restrained Jose and said, "This is the motherfucker that beat the case?" (referring to a 2003 case involving Jose Ruiz, Aguiar and Pereira) and without provocation unexpectedly punched Jose in the left eye with a closed fist.

75. Jose felt blood coming down his face immediately after the punch to the eye.

76. Jones then punched Jose several times in the stomach with a closed fist.

77. Jones then looked at the other officers, and they let go of his arms.

78. Jones then threw Jose into a wall while his nephew was holding his leg, sending the child flying.

79. As Jose bounced off the wall Jones kneed him in the groin.

80. Jones held his left forearm/elbow to Jose's neck, and Jose was having difficulty breathing.

81. Jones shouted at Jose Ruiz to "shut the fuck up!" "Don't move motherfucker"

82. Jones then punched Jose in his left cheek.

83. When Kaydan was thrown, Marisa got up but was called a bitch pushed back down into the chair by Turgeon.

84. Turgeon said, "Your son is fine, get over it."

85. Juan Ruiz who was also seated in the kitchen stood when his son was thrown from Jose's leg.

86. Defendants Oliveira and Pereira literally picked up and threw Juan Ruiz into a room adjacent to the dining room.

87. Jose Ruiz was taken to the floor of Kaydan's bedroom adjacent to the dining room by Aguiar and Jones.

88. Jones and Aguiar both began kicking Jose while he was on the floor and Jose was told to put his arms behind his back.

89. Jose was struck blows to the head and face.

90. Aguiar stepped on Jose's right hand as Jones held it out.

91. As the beating of Jose Ruiz was occurring in one room, Pereira and Oliveira beat Juan Ruiz in a different room.

92. Juan Ruiz was hit twice in the stomach with an elbow strike, after he was thrown.

93. Another officer jumped on Juan Ruiz's legs.

94. Juan Ruiz had had ACL reconstruction surgery on his left leg on January 18, 2007, approximately two months and ten days before.

95. Surgeon Jeremy Stern, M.D. noted in his 3/7/07 note, seven days post beating, "He had an altercation with police officers and had significant injury to both legs during this problem. The patient's left leg, which was responding well to status post ACL reconstruction, is now quite swollen, quite painful. He has positive instability both medially and anteriorly."

96. Jose Ruiz suffered a laceration above his eye and a closed head injury as a result of the severe beating.

97. When Juan Ruiz was brought back into the dining room he asked why they beat Jose, when he had been called to pick up Kaydan at the officers' suggestion.

98. Tyrone Jones said that's what happens when pieces of shit beat cases.

99. Jose said, "Oh so that's what this is about; that's how it is?"

100. Turgeon responded to Jose's question, "Pretty much."

101. At one point Jose and his brother Juan were told to "[s]top whining like little babies. We thought you were tough guys."

102. Jose was handcuffed and told he was being arrested for assaulting a police officer.

103. While still in the apartment Jose told the officers he wanted to go to the hospital, but he wasn't taken to the hospital.

104. When Jose asked for medical help, he was told there was medical care at the Ash Street jail but he did not receive any care and the lack of care amounted to deliberate indifference.

105. As to the child, Jose suggested they call the "babysitter".

106. Phone Digits were given to Turgeon and he dialed, and Jose told Kayla to get the baby.

107. This was actually Jose's girlfriend Kayla who was waiting in the car outside.

108. Kayla and Jose had driven to pick up the child together, but Kayla had remained in the vehicle because she was pregnant.

109. Kayla entered the apartment and was asked to identify herself and show identification.

110. In Spanish Jose told Kayla to call for an ambulance for Jose, Juan and Kaydan.

111. Jose was told by Jones to "Shut the fuck up!"

112. Jose then told Kayla to record Jones' words with her phone.

113. Jones threatened Jose to "Shut the fuck up, or your going to get beat again!"

114. Kayla then tried to photograph, Jones, who chose to strike a pose.

115. Kayla was given a bag by the police with baby things and she exited with Kaydan.

116. Jones came up to Kayla and asked "What happened to the phones that were on the table?"

117. Kayla indicated she didn't know what he was talking about.

118. Jones then searched through Kayla's purse and the baby bag police had provided, where the phones were located.

119. Jose and Juan were separately taken to the police station, but were not taken to St. Luke's.

120. Jose was charged with assault and battery on Jones.

121. Before booking, Jones asked Jose to wipe the blood off his face."

122. At the police station Tyrone Jones approached Jose in the bathroom, saying "It didn't have to be this way. I want to apologize to you as a man."

123. Jose said words the effect, "If you want to be a man, you confront face to face; you don't have three other officers hold a man.

124. Jose then said he was going to leave the issue in God's hands.

125. A criminal trial of Jose Ruiz relative to the charged assault and battery from the Viall Road incident of 2/28/07 was held in New Bedford, and a jury found Jose Ruiz not guilty of all charges on August 29, 2007.

126. Tyrone Jones claimed at the trial that *he* was the victim of an assault and battery by Jose Ruiz, yet no other officer who was present at 20 Viall Street testified on Jones' behalf.

127. In fact, none of the officers present at 20 Viall Street, other than Tyrone Jones, showed to testify at that trial.

128. Now Jose and Juan Ruiz remain fearful of the New Bedford officers.

129. All of the defendant officers present when Jose Ruiz appeared to retrieve his nephew in Juan Ruiz's residence at Viall Street, saw, heard or participates in the assaults on Jose Ruiz and Juan Ruiz.

130. Jones knew his punch to Jose Ruiz's head could cause serious injury and could result in disfigurement, neurological injury or death.

131. At all times pertinent hereto, the defendant officers and their supervisors up the chain of command in the NBPD knew that, unless a person posed an imminent threat of serious bodily harm to an officer or another person, it was unlawful for an officer to strike such person in the head or choke them because of the risk such action would cause serious bodily injury or death.

132. At all times pertinent hereto defendants also knew that the NBPD use of force policy prohibited strikes to the head and other high risk areas of a person who posed no imminent threat of harm to another, because of the risk of serious, disabling, or fatal injury.

133. Nevertheless, before the arrests of Jose and Juan Ruiz, there were multiple incidents where NBPD officers used excessive force without justification.

134. Before plaintiffs were beaten, neither Mayor Lang nor Chief Teachman took any measures to ban, control, monitor or to re-train officers on risks of excessive force.

135. The failures of the chief of police and the mayor to discipline NBPD officers for using excessive force was the moving force behind the violation of plaintiffs' Constitutional rights on February 28, 2007.

136. Before plaintiffs' beating, The City, the Chief and the Mayor knew that NBPD Officers were using excessive force with citizens.

137. Massachusetts General Laws Chapter 276 § 33 governed the examination of injured prisoners, providing that: "Whenever a person is arrested for a crime and taken to or confined in a jail, police station or lockup, the officer in charge thereof shall immediately examine the prisoner, and if he finds any bruises, cuts or other injuries shall forthwith make a written report thereof to the Chief of Police of the town concerned…"

138. This statute is penal in nature and provides that "whoever violates this section shall be punished by a fine of not more than ten dollars."

139. At the time of Ruiz's arrest, writing a use of force report required an officer to describe the type of weapon used, and elaborate on circumstances of its use, that is, to explain how and why the officer was compelled to use the weapon.

140. A use of force report, like the injured prisoner report, would be disseminated and reviewed up the chain of command until it reached the chief.

141. Here, an injured prisoner report was prepared as to Jose Ruiz by Sgt. John Beaudoin. "Observed Luiz (sic) Ruiz in the Booking Area. Mr. Ruiz had a small laceration over his left eye. I asked Mr. Ruiz how the injury occurred, Mr. Ruiz stated that he was jumped from behind. Mr. Ruiz fell to the ground and sustained the injury."

142. This was a lie and a false report.

143. Jason Gomes wrote a report purporting to describe Jose Ruiz's actions on arriving at Juan Ruiz's apartment to pick up his nephew.

144. Gomes wrote, "The male refused to …[words cut off] identification and was very argumentative… [words cut off] Jones pushed Jose Ruiz back against the door jam and then … [words cut off] Jones and Jose Ruiz fell to the floor in the bedroom [words cut off]"

145. This was a lie and a false report, because Jose Ruiz readily identified himself for Turgeon at 20 Viall Street, and he was not injured by a fall to the floor

146. All defendants knew that pursuant to General Law Chapter 268 § 6A, "whoever, being an officer or employee of the Commonwealth or of any political subdivisions thereof or of any authority created by the general court, in the course of his official duties, files or publishes any false written report, minutes or statement, knowing the same to be false in a material matter, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or by both such fine and imprisonment."

147. Each supervisor in the chain of command who received a subordinate's use of force report was responsible to review it for completeness to sign it and distribute it to his or her superiors.

148. At the time of plaintiffs' arrest, Chief Teachman was the ultimate recipient and custodian of these records.

149.  This was particularly important when the level of force used by officers involved the use of hands or feet striking a suspect's head.

150.  At the time of the arrest, if a New Bedford officer punched, slapped, kicked or injured a citizen with his hands or feet (justifiably or not), that officer was not required document or describe the type of force in the incident report, nor was the officer required to file any use of force report – even when injuries resulted.

151.  This grossly negligent and reckless policy allowed and encouraged officers to use vague and generic terms in their reports such "mild resistance" or "struggle" without disclosing or explaining their actions during the arrest.

152.  Without requiring officers to submit use of force reports every time they used force (regardless of implements used) it was not possible for Chief Teachman or the City to monitor and assess officers' uses of force to determine if they were proper and lawful.

153.  At the time of the arrest of Jose and Juan Ruiz, New Bedford did not have a system of quality control, in accordance with accepted police practices and procedures, providing for the effective monitoring and oversight of the use of force by its officers.

154.  The failure to have such system amounted to reckless and deliberate indifference to the rights of citizens.

155.  New Bedford's use of force policy permitted officers to employ force as they say fit knowing full well they would not be called to account for injuries to citizens.

156.  By maintaining the aforesaid policy Chief Teachman and the City failed to monitor and control the use of force to assure that it would be used no more often, and to no greater degree, than was necessary and lawful.

157.  New Bedford's unconstitutional use of force policy at the time of Ruiz's arrest, prevented New Bedford and police supervisors from evaluating what force was actually used by field officers and assess whether those uses of force were reasonable.

158.  This unconstitutional policy effectively allowed officers to operate in the field with little supervision and without effective monitoring.

159.  This policy was in whole or in part the moving force behind the violations of the constitutional rights of Jose and Juan Ruiz.

160.  The incident described herein was a "critical incident" because plaintiffs were beaten without legitimate purpose, and both were seriously injured.

11

161. Professional police departments throughout the U.S. –the size of New Bedford, and smaller - had at the time of this arrest policies and procedures to investigate critical police incidents such as this one.

162. Critical incident policies would require a department to have mechanism to initiate an internal investigations as soon as a citizen complained to the police, even if it is done verbally.

163. At the time of plaintiffs' arrest, New Bedford lacked the most basic electronic or computerized system to track citizen complaints, e.g. an early warning or intervention system.

164. An early warning system before the Ruizs' arrest would have given the City and Chief Teachman additional information about prior incidents of misconduct involving its officers and the need for prompt intervention and/or remediation or discipline.

165. New Bedford's and Teachman's failure to implement an early warning system to spot problem officers was in whole or in part a moving force behind the violation of plaintiffs' constitutional rights.

166. Counsel has on numerous occasions by telephone and letter made Freedom of Information Act requests for the results or conclusions of any NBPD investigation.

167. On multiple occasions Assistant City Solicitor has promised various categories of documents, and then failed and then refused to produce them.

168. On January 15, 2009, Chief Teachman responded to requests for investigation conclusions with a two page letter saying, "In conducting the investigation into your particular complaint no evidence was discovered that supported a conclusion that either proved or disproved the allegations. As a result, I have classified the complaint as Not Sustained."

**Stop and Shop Incident**

169. Jose Ruiz filed a complaint with internal affairs after trial on the alleged assault and battery against Tyrone Jones, Jeffrey Silvia and "other officers" for an incident that occurred on September 16, 2008, at approximately 5pm.

170. On that day Mr. Ruiz was parked in the parking lot of Stop and Shop on King's Highway in New Bedford, MA, eating a meal from Wendy's with his girlfriend in the car.

171. Mr. Ruiz exited his car to take a call to his cell phone and noticed a number of unmarked cars and officers focused on him about 15 feet away from his vicinity.

172. The first one to park was Officer Silvia, and others.

173. The officers were harassing/hoping to intimidate Mr. Ruiz in retaliation for the filing of the internal affairs complaint he had filed in connection with his beating on February 28, 2007.

174. Mr. Ruiz was frightened and drove away from the premises, noting that Tyrone Jones was parked nearby, and staring straight at him, as if to try to intimidate Mr. Ruiz.

175. No investigators from New Bedford's internal affairs investigation unit ever contacted Mr. Ruiz about the civilian complaint he filed.

COUNT 1
42 U.S.C. § 1983, 4th & 14th Amendments
<u>Defendants Tyrone Jones, Henry Turgeon III, Jason Gomes, Robert Aguiar, John Pereira, David Lizotte, Paul Oliveira</u>

176. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

177. Defendants put plaintiffs in harm's way and demonstrated behavior that was reckless, callous and deliberately indifferent to plaintiffs' safety.

178. These Defendants used unreasonable and unnecessary force on the plaintiffs.

179. By the same actions described above, the defendants deprived the plaintiffs of clearly established and well settled rights under the Constitution of the United States including the rights under the Fourth and Fourteenth Amendments.

180. The defendants acted with reckless disregard for the plaintiffs' constitutional rights.

181. The defendants recklessly and maliciously beat Jose and Juan Ruiz, and conspired to doctor official reports to cover their misconduct.

182. The defendants acted with reckless and/or malicious disregard of plaintiffs' need for medical attention.

183. As a direct and proximate result of the conduct, plaintiffs suffered the injuries described above.

184. By its longstanding policy of not investigating critical incidents and not disciplining officers when citizens are injured, defendant New Bedford and Chief Teachman condoned the plaintiffs' beating, by leading the individual defendants to believe they would not be held to account for these actions, and put plaintiffs in harm's way.

COUNT 2
MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. c. 112 § 11IM
<u>Defendants Tyrone Jones, Henry Turgeon III, Jason Gomes, Robert Aguiar, John Pereira, David Lizotte, Paul Oliveira</u>

185. The plaintiffs incorporate the above paragraphs by reference into this count as if fully set forth herein.

186. These Defendants deprived the plaintiffs of their rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

187. As a direct and proximate result of the aforesaid unlawful conduct, the plaintiffs suffered the injuries described herein.

COUNT 3
Assault and Battery
<u>Defendants Tyrone Jones, Henry Turgeon III, Jason Gomes, Robert Aguiar, John Pereira, David Lizotte, Paul Oliveira</u>

188. The plaintiffs incorporate the above paragraphs by reference into this count.

189. Defendants committed the common law torts of assault and battery against the plaintiffs.

190. As a direct and proximate result thereof, the plaintiffs suffered the injuries as described.

COUNT 4
42 U.S.C. § 1983, 4th & 14th Amendments
<u>Defendant CITY OF NEW BEDFORD and NBPD</u>

191. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

192. New Bedford and the NBPD have consistently condoned dangerous behavior that is reckless, callous and deliberately indifferent to citizen health and safety.

193. Plaintiffs' safety was compromised knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm to him.

194. The City maintained a policy and/or custom of deliberate indifference to proper supervision, training, discipline and retention of police officers and a policy and/or custom of deliberate indifference to the safety of citizens and persons in custody of the NBPD in failing to discipline its officers for the excessive use of force. As a result of this policy or custom, police officers in the City of New Bedford, including the named individual defendant herein, knew that the use of unnecessary violence and excessive use of force would likely go unnoticed and/or unpunished.

195. The City acted with deliberate indifference to the constitutional rights of citizens and other persons, including the plaintiff, by failing to take adequate steps to supervise and train its officers and to deter them from the use of excessive force.

196. The City acted with deliberate indifference to the constitutional rights of persons in custody of the NBPD as a result of deliberate indifference to the medical needs of prisoners, including the plaintiff.

197. The policies and customs of the City of New Bedford were the moving force behind the acts of the individually named police defendants in the foregoing count and were the cause of the plaintiffs' injuries.

198. As a direct and proximate result of the foregoing, plaintiffs were deprived of rights under the Constitution and caused great pain of body and mind.

COUNT 5
Supervisory Liability/U.S.C. § 1983, 4th & 14th Amendments
Defendants Mayor Scott Lang, Chief Ronald Teachman and DLT David Lizotte

199. The plaintiffs incorporate the above paragraphs by reference into this count.

200. These defendants were both responsible for appointing (hiring), training, disciplining, firing and supervising Defendants Tyrone Jones, Henry Turgeon III, Jason Gomes, Robert Aguiar, John Pereira, and David Lizotte.

201. Each deliberately or recklessly and sanctioned, allowed, and condoned acts of misconduct to occur, including acts of excessive use of force, and denial of access to medical care.

202. Each by their acts and omissions adopted, continued and perpetuated the polices and practices of their predecessors in failing to monitor, control and remediate excessive and unnecessary use of force by New Bedford police officers and otherwise disregarding the civil rights of citizens who come into contact with said officers by failing to appropriately hire, train, monitor, investigate, discipline or dismiss officers of their respective departments as alleged herein.

203. By the same actions described above, these defendants deprived the plaintiffs of clearly established and well settled rights under the Constitution of the United States including the rights under the First, Fourth and Fourteenth Amendments.

204. These defendants acted with reckless disregard for the plaintiffs' constitutional rights.

205. Their actions, inactions, or omissions were the moving force behind plaintiffs' injuries.

206. As a direct and proximate result of the conduct, plaintiff was harmed as described above.

COUNT 6
NEGLIGENCE, M.G.L. c. 258
CITY OF NEW BEDFORD

207. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

208. On February 23, 2009, plaintiffs' counsel gave notice and presentment to New Bedford accordance with the Massachusetts Tort Claims Act. M.G.L c. 258 et seq.

209. On March 4, 2009, the City Solicitor's office of New Bedford acknowledge receipt of the letter/notice of claim.

210. Counsel for Plaintiffs complied with all conditions precedent and the recipients failed to respond with an offer of settlement within the sixth month time period required by state law.

211. As a direct and proximate result of the negligence of the defendants, Jose Ruiz and Juan Ruiz suffered severe emotional distress, great pain of body and mind.

COUNT 7
CONSPIRACY
Defendants Tyrone Jones, Henry Turgeon III, Jason Gomes, Robert Aguiar, John Pereira, David Lizotte, Paul Oliveira

212. The plaintiffs incorporate the above paragraphs by reference into this count as if fully set forth herein.

213. These Defendants did conspire to hide the beating of Plaintiffs Jose Ruiz and Juan Ruiz.

DEMANDS FOR RELIEF

The Plaintiffs hereby respectfully request the following relief:

1. All compensatory damages recoverable;
2. Injunctive relief;
3. All punitive damages recoverable;
4. All attorney's fees, costs and expenses allowable;
5. Any and all other relief as the Court deems just and proper;
6. That defendants be found joint and severally liable

PLAINTIFFS DEMAND A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT

          Respectfully submitted,
Plaintiffs JOSE RUIZ and JUAN RUIZ
By their attorneys,

/s/ Robert Beadel
_____

Hector E. Pineiro, BBO # 555315
Robert H. Beadel, BBO #632447
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

Dated: February 25, 2010